# IN THE COURT OF APPEALS OF IOWA

No. 20-0354
Filed August 5, 2020

**IN THE INTEREST OF K.S.,**
**Minor Child,**

**A.S., Mother,**
        Appellant.
_____

Appeal from the Iowa District Court for Winneshiek County, Linnea M.N.
Nichol, District Associate Judge.

A mother appeals the termination of her parental rights. **REVERSED AND**
**REMANDED.**

Nicholas E. Hay of Hay Law, P.L.C., Decorah, for appellant mother.

Thomas J. Miller, Attorney General, and Ellen Ramsey-Kacena, Assistant
Attorney General, for appellee State.

Whitney L. Gessner of Gessner Law Office, Monona, attorney and guardian
ad litem for minor child.

Considered by Tabor, P.J., May, J., and Vogel, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206
(2020).

**MAY, Judge.**

A mother appeals the termination of her parental rights to her child, K.S. We conclude the State did not carry its burden of proving statutory grounds for termination by clear and convincing evidence. So we reverse and remand.

K.S. was born in 2007. For the first nine and a half years of her life, K.S. lived in Wisconsin with her mother and two sisters—I.M (born 2004) and S.K. (born 2005).

In late December 2016, Wisconsin authorities responded to allegations that K.S. and S.K. were physically fighting and the mother failed to intervene or address the situation. Because of this incident, the mother was arrested and criminally charged with neglect. Those charges were dismissed. But a no-contact order was entered between K.S. and S.K. And K.S. was placed in her father's custody. He lived in Iowa.

In May 2017, the Iowa Department of Human Services (DHS) removed K.S. from the father's home based on concerns the father committed domestic abuse on his paramour and used illegal drugs. In August, the juvenile court adjudicated K.S. as a child in need of assistance (CINA) as defined in Iowa Code section 232.2(6)(c)(2) and (n) (2017). K.S. was placed with a foster family in Iowa.

In February 2019, the State filed a petition for termination of parental rights. In July, the juvenile court issued an order terminating both parents' rights. The court concluded grounds for termination existed under Iowa Code section 232.116(1)(d) and (f) (2019).

The mother filed a motion to reconsider, amend, or enlarge. In February 2020, the court issued a responsive order. The February order included several

amendments to the July order. But the court declined to change its conclusions of law or its order to terminate the rights of both parents. The mother now appeals.[1]

It is well-established that Iowa courts may not terminate a parent's rights unless the State has proven statutory grounds for termination by clear and convincing evidence. *See In re M.S.*, 889 N.W.2d 675, 679 (Iowa Ct. App. 2016). In this case, the juvenile court determined the State had met its burden of proof under paragraphs (d) and (f) of Iowa Code section 232.116(1). We review those determinations de novo. *In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010). As with all statutes, we must apply section 232.116(1) as it is written. *See In re C.S.*, No. 19-1444, 2020 WL 1550675, at *1 (Iowa Ct. App. Apr. 1, 2020).

We begin our review with subparagraph (d), which states in pertinent part:

> [T]he court may order the termination of both the parental rights with respect to a child and the relationship between the parent and the child on any of the following grounds:
> . . . .
> d. The court finds that both of the following have occurred:
> (1) The court has previously adjudicated the child to be a child in need of assistance *after finding the child to have been physically or sexually abused or neglected as the result of the acts or omissions of one or both parents*, or the court has previously adjudicated a child who is a member of the same family to be a child in need of assistance after such a finding.
> (2) Subsequent to the child in need of assistance adjudication, the parents were offered or received services to correct the circumstance which led to the adjudication, and the circumstance continues to exist despite the offer or receipt of services.

Iowa Code § 232.116(1)(d) (emphasis added).

"Within chapter 232, 'physical abuse or neglect' and 'abuse or neglect'" are defined to mean "any nonaccidental physical injury suffered by a child as the result

---

[1] The father does not appeal.

of the acts or omissions of the child's parent, guardian, or custodian or other person legally responsible for the child." *In re J.S.*, 846 N.W.2d 36, 41 (Iowa 2014) (quoting Iowa Code § 232.2(42)).

So, to decide whether the State has met its burden under paragraph (d), we begin by looking to the adjudication order to determine whether K.S. was adjudicated CINA based on a finding that K.S. suffered "any nonaccidental physical injury." *See In re A.R.*, No. 14-1204, 2015 WL 800075, at *2–3 (Iowa Ct. App. Feb. 25, 2015). The record shows K.S. was adjudicated CINA in August 2017. The adjudication order cites section 232.2(6)(c)(2) and (n). Neither of those paragraphs requires a finding of nonaccidental physical injury.[2] Nor did the order contain any factual findings of nonaccidental physical injury. Instead, the court cited the father's incarceration and recent use of methamphetamine while caring for children. Those are certainly causes for concern. But they do not—in themselves—amount to a nonaccidental physical injury.

---

[2] Those provisions state as follows:
> 6. "Child in need of assistance" means an unmarried child:
> . . . .
>     c. Who has suffered or is imminently likely to suffer harmful effects as a result of any of the following:
>     . . . .
>     (2) The failure of the child's parent, guardian, custodian, or other member of the household in which the child resides to exercise a reasonable degree of care in supervising the child.
>     . . . .
>     n. Whose parent's or guardian's mental capacity or condition, imprisonment, or drug or alcohol abuse results in the child not receiving adequate care.

Iowa Code § 232.2(6)(c)(2), (n).

Because K.S. was not adjudicated CINA based on a finding of nonaccidental physical injury, the State could not meet its burden of proof under paragraph (d). *See A.R.*, 2015 WL 800075, at *3 ("In the absence of a CINA determination that satisfies (d)(1), we have no identification of statutorily authorized circumstances which require correction under (d)(2).").

We turn next to paragraph (f), which states in pertinent part:

> [T]he court may order the termination of both the parental rights with respect to a child and the relationship between the parent and the child on any of the following grounds:
>      . . . .
>      f. The court finds that all of the following have occurred:
>      (1) The child is four years of age or older.
>      (2) The child has been adjudicated a child in need of assistance pursuant to section 232.96.
>      (3) The child has been removed from the physical custody of the child's parents for at least twelve of the last eighteen months, or for the last twelve consecutive months and any trial period at home has been less than thirty days.
>      (4) There is clear and convincing evidence that at the present time the child cannot be returned to the custody of the child's parents as provided in section 232.102.

Although the mother concedes elements (1) through (3), she contests element (4). To carry its burden under element (4), the State must prove by clear and convincing evidence that the child could not be safely returned to the mother at the time of the termination hearing. *In re T.W.*, No. 20-0145, 2020 WL 1881115, at *1 (Iowa Ct. App. Apr. 15, 2020) (collecting cases). Clear and convincing evidence "means there must be no serious or substantial doubt about the correctness of a particular conclusion drawn from the evidence." *M.S.*, 889 N.W.2d at 679.

Following our de novo review, we conclude the State did not meet this "heavy evidentiary burden." *Cf. In re B.C.*, No. 18-1442, 2019 WL 1300456, at *3

(Iowa Ct. App. Mar. 20, 2019) (discussing clear-and-convincing-evidence standard in a chapter 600A termination appeal).  In fact, considerable evidence shows the mother could be a safe custodian.  Two DHS employees—a social worker and a family safety, risk, and permanency worker—testified there were no safety concerns between K.S. and the mother.  And the no-contact order between K.S. and S.K. is no longer in effect.  Moreover, two months before the termination hearing, the Health and Human Services Department for Brown County, Wisconsin (the Department) completed a "thorough home study" of the mother's home in Green Bay.  The study documented numerous positive features of the mother's home, including: (1) her apartment has four bedrooms, which would allow each of her children to have their own beds in their own rooms; (2) the apartment is close to schools, shopping, and medical facilities; (3) the mother established supports within the Green Bay community for the family, including in-home mental-health counseling; and (4) the mother "works well with [her children's] schools and supports her children in order to be successful and helps address any concerns that arise."  Ultimately, the study "support[ed] that the mother has addressed and eliminated all prior concerns."  And the Department recommended "placement of" K.S. with the mother.

In our view, the State has provided no reason to disregard the Department's assessment and recommendation.  In fact, neither the State nor the guardian ad litem has pointed to evidence that the mother's home was not safe for K.S. in May 2019, when the termination hearing was held.  For example, unlike with the father, there was no evidence the mother or any occupant of her home was using methamphetamine.  *See, e.g.*, *In re J.P.*, No. 19-1633, 2020 WL 110425, at *2

(Iowa Ct. App. Jan. 9, 2020) ("A parent's methamphetamine use, in itself, creates a dangerous environment for children."); *In re K.L.*, No. 17-0346, 2017 WL 2465817, at *1 (Iowa Ct. App. June 7, 2017) ("Methamphetamine is a scourge.").

We recognize that, although the mother regularly visited with K.S. on the phone, she has attended few in-person visitations. But the circumstances of this case are unusual. While K.S. was in foster care in Iowa, the mother lived in Wisconsin. And, according to DHS, legal and logistical barriers prevented visitations in Wisconsin. So each in-person visitation required the mother to travel several hours out of state and stay overnight in a hotel. Every time the mother was to attend visitation, she was tasked with securing gas money, funding for hotel stays, and coordination of all of her children's needs.[3] The mother is indigent and has two other children. And we recognize that balancing the logistics of interstate travel with her parenting responsibilities for two other children would be difficult, particularly as a single, indigent parent. So while we do not minimize either the importance of visitation generally or DHS's concerns here, we think this case calls for us to use a different lens than we might in other cases. And, in any event, we do not find the mother's visitation record provides clear and convincing evidence that K.S. could not be safely returned to the mother's care.

We have considered the juvenile court's conclusion that "[w]ithout the opportunity to observe the children together on an in-person visitation, it is impossible to assess the safety concerns" that led to removal of K.S. from the mother's home. We are concerned that this implies the burden of proof shifted to

---

[3] DHS did provide some financial assistance, but it did not cover the entire cost associated with visitations and was provided after the fact.

the mother to establish that her home was safe. Under Iowa law, the burden of proof to establish statutory grounds for termination always remains with the State. It must prove by clear and convincing evidence that the home was *not* safe.

We also bear in mind that strife with sibling S.K. was the key circumstance leading to K.S.'s removal from the mother's home. But the Department has reported S.K. is doing better expressing herself appropriately, the mother is disciplining her children appropriately, and both of K.S.'s siblings want her to return to the home. In light of this information, and our review of the record as a whole, we conclude the State has not proven by clear and convincing evidence that concerns about K.S.'s safety in the home persist.

Because the State failed to prove statutory grounds for termination by clear and convincing evidence, we must reverse.

**REVERSED AND REMANDED.**

Tabor, P.J., concurs; Vogel, S.J., dissents.

**VOGEL, Senior Judge** (dissenting).

Because of the mother's lack of compliance with offered services, I respectfully dissent from the majority and would affirm the termination of the mother's parental rights.

When a child is removed from the home, the parent is tasked with certain obligations to bring about reunification. *See In re C.B.*, 611 N.W.2d 489, 494 (Iowa 2000) ("[T]hus, in considering the sufficiency of evidence to support termination, our focus is on the services provided by the state *and the response by [the parent]* . . . ." (emphasis added)).

In this case, the mother failed in her efforts, and after two years of monitoring the situation—plus another five months before the motion-to-enlarge hearing—the juvenile court essentially said, "enough is enough" and terminated the mother's parental rights.

To begin, the juvenile court was informed that from 2007 to 2016, the Wisconsin child welfare agency compiled an "extensive history" of involvement with the mother's household.[4] The history included multiple unsubstantiated allegations of physical abuse or neglect by the mother and others upon K.S. as well as the other children in the household. In December 2016, Wisconsin responded to allegations the children in the home were physically fighting and the mother failed to intervene or address the situation. As a result of this incident, the mother was arrested and criminally charged under Wisconsin Code section 948.21(1)(b) (2016) with neglecting a child (consequence is bodily harm); a no-

---

[4] Although the mother acknowledged having several physical- and mental-health concerns, the court did not rely on those concerns to support termination.

contact order was entered in Wisconsin between the child and her half-sister; and Wisconsin placed sole custody of K.S. with the father in Iowa.[5]

After K.S.'s removal from her father's home on May 28, 2017, and her adjudication as a child in need of assistance on August 9, the October 11 dispositional order adopted and incorporated the permanency plan by the Iowa Department of Human Services (DHS), which among other things required the mother to participate in individual counseling. She was also to participate in family team meetings to "work out issues of visitation among [the] siblings."

To that end, DHS attempted to coordinate supervised visitation between the child in Iowa and the mother in Wisconsin, but only fourteen such visitations occurred prior to the May 22, 2019 termination hearing.[6] The mother made visitation much more problematic in March 2018, when she decided to move another two hours north in Wisconsin, extending her drive to Iowa for visits from approximately three hours to five hours. DHS continued to offer the mother assistance with visitation, including partial reimbursement for gas and lodging and "brainstorming" other ways to make the trip more affordable. A DHS worker testified she reached out to the mother on a monthly basis to offer visits. Nevertheless, weeks, and sometimes months, went by without the mother

---

[5] The father was granted sole custody of K.S. in February 2017; the criminal charges against the mother were dismissed in July 2017; and the no-contact order was dismissed in December 2018.

[6] In-person supervised visitation between the mother and child occurred on June 5, 2017; June 14, 2017; August 9, 2017; August 27, 2017; September 28, 2017; November 11, 2017; November 26, 2017; December 3, 2017; January 13, 2018, June 6, 2018; March 20, 2019; April 6, 2019; May 4, 2019; and May 18, 2019. The DHS worker testified to the legal and logistical issues that required all in-person visits to occur in Iowa near the foster home. Some of these visits extended over two days due to the distance the mother travelled.

attempting to visit K.S. Notably, she only visited K.S. on two occasions in 2018. The mother faulted the no-contact order between the two half-siblings as a roadblock but admitted she did not contact her attorney, the child's guardian ad litem, or the supervising agency to request visitation. While DHS did not raise concerns with the mother's behavior during the in-person visitations that did occur, the mother's modest attempts to participate with in-person visitations hindered her from demonstrating adequate improvement in her parenting ability. Even as DHS and the mother set a visitation schedule for the weeks leading up to the termination hearing, the mother failed to show for three of the seven pre-arranged visits.

The DHS worker testified the mother's "lack of visits is one of the key reasons to request the" termination. She also testified that, based on past behavior, she did not anticipate improved efforts by the mother should the court grant more time for reunification. From the mother's half-hearted attempts to participate in visitation, and the resulting inability of DHS to observe the mother's conduct with K.S. and her siblings, the juvenile court made this finding: "Without the opportunity to observe the children together on an in person visitation, it is impossible to assess the safety concerns." I agree with the majority that the way this specific finding was worded appears to fall short of the clear-and-convincing standard required in termination of parental rights proceedings. *See In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010) ("Evidence is 'clear and convincing' when there are no 'serious or substantial doubts as to the correctness [of] conclusions of law drawn from the evidence." (quoting *C.B.*, 611 N.W.2d at 492)). But I do not agree that the court's ultimate finding lacked clear and convincing evidence nor that the court shifted the burden of proof to the mother. Rather, the record was replete with

examples of the mother's failure to comply with her obligations under the disposition and review orders for reunification. *Cf. C.B.,* 611 N.W.2d at 495 ("In this case, the DHS performed its role of providing services. The problem, however, was not with the services but was with [the mother's] response to those services.").[7] As the guardian ad litem noted, "[t]he mother had treated K.S. as an afterthought for two years . . . . The mother's lack of effort at making herself available for visits was well-documented throughout the case . . . ."

Further, the Wisconsin home study, which the mother asserts offered support for her position, gave no indication to DHS that the worker even met with K.S. Therefore, the worker had not observed any interaction either between the mother and K.S. or between the mother, K.S., and the other siblings. This interaction was critical for DHS and the juvenile court's determination as to whether K.S. could be safely returned to her mother's care. In fact, the study noted "there are still incidents of aggression by [S.K.] towards others (sister and mom) and continued engagement in family counseling is needed for [the mother]." The children's history of physical aggression—undeterred by the mother—was the root cause of the need for K.S. to be removed from the mother's home in early 2017

---

[7] The mother's situation is somewhat akin to a drug-dependent parent required to show adequate compliance with drug treatment to secure reunification. If the parent failed to submit to drug testing or participate in treatment, the court could conclude the reunification requirements were not met and therefore, with the statutory timeframe having been met, termination would be appropriate. *See, e.g.*, *In re T.P.*, 757 N.W.2d 267, 270–71 (Iowa Ct. App. 2008) ("[The mother] claims she has been clean from drugs since February 2007, but that is not bore out by the record as she stopped using DHS services, did not submit to drug tests, and has not completed a substance abuse treatment program. Further, because [the mother] has not complied with recommended mental health services, it is clear [the mother] cannot care for [the children] either now or in the foreseeable future." (citation omitted)).

with sole custody given to the father. By the time of the termination hearing, this remained the unaddressed concern of DHS and the court.

Thus, it was proper for the juvenile court to conclude the State carried its burden of proof, that a return to the mother's care would have subjected K.S. to adjudicatory harm under Iowa Code section 232.2(6)(c)(2); the result of the failure of the mother to show she could exercise a reasonable degree of care in supervising K.S. with the other siblings.

And time marches on. It is important to note that K.S. has been out of the mother's home since December 2016 and out of both parents' care since May 2017. Now, at age thirteen, this child should not continue waiting for permanency, especially considering the mother's limited engagement with DHS since removal. *See In re D.S.,* 806 N.W.2d 458, 474 (Iowa Ct. App. 2011) ("We will not gamble with a child's future by asking him [or her] to continuously wait for a stable biological parent, particularly at such a tender age."). Once the limitation period lapses, termination proceedings must be viewed with a sense of urgency. *In re L.L.,* 459 N.W.2d 489, 495 (Iowa 1990).

The days, weeks, months, and years dragged on, and the mother's lukewarm efforts gave DHS scant ability to recommend reunification. The mother's failure led the juvenile court to finding clear and convincing evidence the child could not be returned to the mother's custody without suffering adjudicatory harm. I agree with the juvenile court and would affirm that the grounds for termination under section 232.116(1)(f) were satisfied.